FILED
SUPERIOR COURT
OF GUAM

2021 APR 26 PM 1: 30

CLERK OF COURT

By:_____

IN THE SUPERIOR COURT OF GUAM

| | | |
|---|---|---|
| PEOPLE OF GUAM | ) | CRIMINAL CASE NO. CF0602-20 |
| | ) | |
| vs. | ) | |
| | ) | |
| BERNARD JOEL MENO MUNA, | ) | DECISION AND ORDER DENYING |
| (*aka* Bernard Joel Muna) | ) | MOTION TO SUPPRESS |
| DOB: 08/16/1985 | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## INTRODUCTION

This matter came before the Honorable Judge Maria T. Cenzon upon Defendant's Motion to Suppress and Request for Suppression Hearing filed on February 26, 2021. The People of Guam ("People") are represented by Assistant Attorney General Renaida San Nicolas. Defendant Bernard Joel Meno Muna ("Defendant" or "Muna") is represented by Assistant Public Defender Zachary C. Taimanglo of the Public Defender Service Corporation. All parties were present *in person* at the suppression hearing on April 7, 2021. For the reasons set forth below, having reviewed the testimony and oral arguments of both parties, the Court **DENIES** Defendant's Motion to Suppress.

## PROCEDURAL AND FACTUAL BACKGROUND

On December 1, 2020, the People filed a Magistrate's complaint charging Muna with the offenses of *Two Counts* of Criminal Mischief (As a Third Degree Felony), and *One Count* of Family Violence (As a Third Degree Felony). See Magistrate's Compl. (Dec. 1, 2020). Each

charge was accompanied with notice of Special Allegation: Possession or Use of a Deadly Weapon in the Commission of a Felony. *Id.* The Magistrate Judge, the Honorable Jonathan R. Quan dismissed the charge of Family Violence without prejudice after finding the charge lacked probable cause. See Order of Dismissal (Charge Two) (Dec. 1, 2020). Thereafter, an Indictment was filed on January 5, 2021, charging Muna with *Two Counts* of Criminal Mischief (As a Third Degree Felony) with notice of Special Allegation: Possession or Use of a Deadly Weapon in the Commission of a Felony, and *One Count* of Family Violence (As a Third Degree Felony) with notice of Special Allegation: Possession or Use of a Deadly Weapon in the Commission of a Felony. See Indictment (Jan. 5, 2021).

The Indictment stems from events on November 30, 2020, when Muna allegedly damaged two vehicles with a crowbar and then fled the scene. See Magistrate's Compl., Decl. (Dec. 1, 2020). Later on the same date, Muna allegedly struck another victim in the knee with a crowbar. *Id.* Muna was located by officers and was "handcuffed . . . and placed . . . in the back of a police vehicle." See Mot. to Supress, at 4 (Feb. 26, 2021). He was then "transported to a police station where he was interrogated." *Id.* While being interviewed, Muna "denied assaulting Victim 3, but did admit to damaging the cars . . . with a crowbar." See Magistrate's Compl., Decl. (Dec. 1, 2020).

On February 26, 2021, Muna filed a Motion to Suppress and Request for Suppression Hearing seeking to suppress "any and all statements attributed to him by police for violations of the 5th Amendment." Mot. to Supress, at 4 (Feb. 26, 2021). A hearing was held on this matter on April 7, 2021, wherein Officer Martin P. Oliva ("Officer Oliva") testified as the People's only witness. See generally Min. Entry (Apr. 7, 2021).

At the suppression hearing, Officer Oliva testified that he received information regarding a complaint by a distraught female who was being chased by her uncle. *Suppression Hrg.* at 11:05:50 AM (Apr. 7, 2021). Oliva testified that when they pulled up to the scene of the incident on Espinosa Avenue the alleged victim Kealoah Muna alighted from a vehicle and stated "my uncle [the Defendant] just assaulted me. He's at the house." *Id.* at 11:05:58-11:06:42 AM. While other officers interviewed the complainants, Officer Oliva met with the Defendant, informed him that a criminal complaint was filed against him and asked him if he would accompany him to the Agat Precinct to make a statement. *Id.* 11:07:00–11:07:45 AM. Officer Oliva transported Defendant to Agat Precinct in a GPD vehicle.

At the Agat Precinct, Officer Oliva testified that he advised the Defendant of his rights using the Guam Police Department "GPD 9" Custodial Rights Interrogation Form. *Id.* 11:07:48-11:08:17 AM. Although Officer Oliva keeps a small *Miranda* warnings card with him, he did not give the Defendant any *Miranda* warnings while at the scene on Espinosa Avenue because he decided he was not going to question the Defendant there.[1] *Id.* 11:08:21-11:08:38 AM. Instead, at the Agat Precinct, he provided Defendant with the Custodial Interrogation Form and advised him of his rights. The following is Officer Oliva's testimony regarding what then transpired during the interrogation:

> SAN NICOLAS:[2] Did Mr. Bernard look at your custodial interrogation form?
> OLIVA: Yes, when we were at the precinct.
> SAN NICOLAS: What else did he do?
> OLIVA: I advised him of his rights; he wished to speak with me, however, when I got down to the portion where it says the "Waiver of Rights," he said that "I don't wanna waive my rights." And I told him, well, it's not waiving your rights, you're kind of asserting your rights here in a sense. So I instructed him several times that at any time you can stop talking to me. He said, "What if I don't want to sign?" Okay, you don't

[1] All references to "*Miranda*" herein are to *Miranda v. Arizona*, 384 U.S. 436, 460 (1966).
[2] Reference is to Assistant Attorney General Renita San Nicolas.

have to sign, I advised you of your rights already. You can still make a statement and from there, he agreed to talk.[3]

SAN NICOLAS: What, if anything, did he say to you? * * *

OLIVA: After advising him of his rights, I asked him if he struck Kealoha, his niece, he said no, and I asked him if he any problems with his niece and he said, "they're doing something to my children." When I asked him, "Who?" he declined to comment further; however, after that he did utter that, "But I did damage my niece's car."

SAN NICOLAS: Ok, and what, if anything did you do upon hearing that statement?

OLIVA: I told him to stop. I re-advised him of his *Miranda* rights via my card and also, his *Miranda* rights were already still in effect.

SAN NICOLAS: Ok, and anything else after that?

OLIVA: No, Ma'am.[4]

On cross-examination, Defense Counsel admitted into evidence as Exhibit A, a portion of Officer Oliva's "Arrest Information Sheet."[5] Exhibit A indicates largely what was testified to on cross-examination. Defendant was administered his *Miranda* rights via a Custodial Interrogation Rights form, or GPD 9 form, "to which he acknowledged, refused to sign, but indicated a willingness to make a statement without legal counsel present." *People's Ex. A.* After Defendant is reported to have uttered, "I did go up to my Niece's house earlier today and damaged the cars there with a crowbar." The narrative indicates that Officer Oliva instructed Defendant to stop speaking, "whereby I verbally informed him of his *Miranda* Rights Again." *Id.* Defendant then declined to be interviewed further.

Also, during his cross-examination, Oliva explained further what transpired between him and the Defendant during the interrogation at the Agat Precinct: Officer Oliva admitted that he did not sign the GPD 9 form on the "witness" portion and "that is my mistake" nor was there a witness present who would have signed on the second line of the form set aside for witnesses. Additionally, Oliva testified that there was no recording of the interview or

---

[3] *Suppression Hrg.* 11:08:45 – 11:09:21 AM.

[4] *Id.* 11:10:13 - 11:12:04 AM.

[5] Admitted into evidence was Defendant's Exhibit A, which is page 25 of Officer Oliva's Arrest Information Sheet for Case Number 2020-00030068 dated November 30, 2020.

interrogation of the Defendant at Agat Precinct, nor is there any recording equipment which would have recorded such interview. *Id.* 11:20:56 AM.

When Defense Counsel asked him about continuing to interrogate the Defendant after Defendant indicated he did not want to waive his *Miranda* rights, Oliva responded as follows:

> OLIVA: So I told him about his rights, like I was telling the prosecutor here, I read him his rights, the last portion there which he *did* sign, and I told him specifically, and said it numerous times, umm., you can still talk to me, however, though you can stop answering at any time until you talk to a lawyer. That is your right. So, once he read the bottom portion where it said "Waiver of his rights" he said, "I don't, ummm, I don't want to sign this, okay, but, you know I do want to talk, 'cos I don't want to waive my [inaudible]." Okay then. I did read him his rights and he understood and I proceeded with the interrogation.[6]

It is not disputed, and the Court finds, that at the time of the interrogation by Officer Oliva, the Defendant was not free to leave either the residence at Espinosa Avenue nor the Agat precinct on his own. Additionally, while being transported from Espinosa Avenue by Officer Oliva, the Defendant's freedom was restricted and he is deemed to have been "in custody" from the time of his transport to Agat Precinct. Officer Oliva administered the *Miranda* rights to Defendant at 6:49 p.m. on November 30, 2020 while at the Agat Precinct, he was interviewed at 6:53 p.m. on the same day, and was arrested at 7:15 p.m. on the same day. There was no evidence presented to the court that Defendant was in custody for a protracted period of time before being *Mirandized,* interviewed, and arrested. There is no evidence that Defendant made any statements prior to being *Mirandized.* No other witnesses were presented to the Court during the suppression hearing.

After hearing the testimony and the arguments of both parties, the Court took the matter under advisement and now issues this Decision and Order.

---

[6] *Id.* 11:20:56 - 11:22:00 AM.

DISCUSSION

The Fifth Amendment of the United States Constitution and the Guam Organic Act, Section 1421b(d), state: "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V; 48 U.S.C.A. § 1421b(d). The United States Supreme Court explains, in order "to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government . . . produce the evidence against him by its own independent labors." *Miranda v. Arizona,* 384 U.S. 436, 460 (1966). Thus, the only way to vindicate the Fifth Amendment's constitutional protections against self-incrimination is to allow the accused "the right to remain silent unless he chooses to speak in the unfettered exercise of his free will." *Id.* In order to protect that constitutional right, "[a]t the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent." *Id.* at 467-468 (1966).

A *Miranda* warning is a necessary function of police interrogation and "[u]nless and until *Miranda* warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of custodial interrogation can be used against a defendant." *United States v. Williams,* 842 F.3d 1143, 1146 (9th Cir. 2016); See also *People v. Parker,* 395 P.3d 208, 230 (Cal. 2017) ("A defendant must be advised of his or her Miranda rights, and must make a valid waiver of these rights before questioning begins or any statements resulting from interrogation can be admitted."). The Guam Supreme Court has held that "[p]ersons must be advised of their rights prior to a custodial interrogation," or that evidence becomes inadmissible. *People v. Farata,* 2007 Guam 8 ¶ 20; See also *People v. Sangalang,* 2001 Guam 18 ¶ 12.

On the other hand, a suspect who has been informed of his rights "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and

intelligently." *Miranda*, 384 U.S. at 444 (1966). However, "[t]here is a presumption against the finding of a waiver, and the prosecution bears the burden of proving by a preponderance of the evidence that a defendant knowingly and intelligently waived his Miranda rights." *Sangalang*, 2001 Guam 18 ¶ 13. The United States Supreme Court has held that proof of waiver requires surpassing a heavy burden: "[s]ince the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders." *Miranda,* 384 U.S. at 475 (1966). The rationale for the prosecution's "heavy burden" is based on the traditional principle of constitutional law that a suspect's waiver of rights will not be "lightly inferred," and courts will "indulge every reasonable presumption against the waiver of a fundamental right." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

Moreover, "[a] valid waiver of [a defendant's] Miranda rights depends on the totality of the circumstances, including the background, experience, and conduct of the defendant." *Samalang*, 2001 Guam 18 ¶ 13 (*quoting United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998)). In considering whether a waiver is voluntary and absent coercion, the courts will look to several factors, including: age, education, and intelligence of the defendant; the length of detention and questioning; whether Miranda warnings were given; the defendant's physical and mental characteristics; and the location of the interrogation. See *U.S. v. Chalan*, 812 F.2d 1302, 1307 (10th Cir. 1987). "In no case, however, is any single factor determinative." *Id.* Once, a defendant validly waives his *Miranda* rights, interrogation may continue until the defendant invokes his rights or changed circumstances suggest the responses have become involuntary. See *U.S. v. Abreu*, 730 F. Supp. 1018, 1030 (D. Colo. 1990).

In deciding if the waiver was intelligent, the court looks at whether "the defendant knew that he did not have to speak to police and understood that statements provided to police could be used against him." *U.S. v. Hernandez*, 913 F. 2d 1506, 1510 (10th Cir. 1990). The defendant need not "appreciate the tactical advantage of remaining silent" for the waiver to be intelligent. *Id.* The Supreme Court has "never 'embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness.'" *Connecticut v. Barret*, 479 U.S. 523, 530 (1987) (*quoting Oregon v. Elstad*, 407 U.S. 298, 316 (1985)).

Finally, even when the police provide a custodial interrogation waiver form, "the refusal to sign the form d[oes] not indicate a desire to remain silent." *U.S. v. Speaks*, 453 F.2d 966, 969 (1972). As courts have repeatedly held, "refusal to sign the written waiver form . . . is not fatal; Miranda does not require a written waiver, but only a waiver made voluntarily, knowingly, and intelligently." *Klingler v. U.S.*, 409 F.2d 299, 308 (8th Cir. 1969). See also *U.S. v. Moreno-Lopez*, 466 F.2d 1205 (9th Cir. 1972); *State v. Wallace*, 94 P.3d 1275 (Haw. 2004). In other words, "[r]efusal to sign a waiver form or a written statement, although some evidence of the absence of waiver, may be outweighed by affirmative conduct indicative of a knowingly and intelligently made decision not to remain silent. . . ." *State v. Harris*, 452 A.2d 634, 637 (Conn. 1982).

The Guam Supreme Court has likewise confronted this issue, and has held that "[a defendant's] willingness to speak with the officer [is] a 'course of conduct indicating waiver,' notwithstanding his refusal to sign the advice-of-rights form." *People v. Chong*, 2019 Guam 20 ¶ 15 (*citing Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010)). The United States Supreme Court has reasoned that a defendant may still waive his right against self-incrimination while refusing to sign a waiver of rights form if: "(1) the defendant's understanding of English was

sufficient evidence he understood the rights presented, (2) the fact that he answered the officer's questions was a sufficient "course of conduct indicating waiver," and (3) there was no evidence that the defendant was coerced." *Berghuis*, 560 U.S. at 385; See also *Chong*, 2019 Guam 20 ¶ 14.

Here, it is undisputed that Defendant was in custody and thus subjected to a custodial interrogation. See Mot. to Suppress at 4 (Feb. 26, 2021) ("A GPD officer handcuffed Mr. Muna and placed him in the back of a police vehicle. Mr. Muna was then transported to a police station where he was interrogated."). It is also undisputed that Defendant was provided with a "Custodial Interrogation" form at the Agat Precinct. See Min. Entry, at 11:21:49 AM (April 7, 2021); *Def's Exhibit 1*. However, Officer Oliva testified that, after providing him with GPD 9 Custodial Interrogation Form, Muna initialed the portions of the form acknowledging that he had been informed of his *Miranda* rights. After acknowledging that he understood his rights, he informed Oliva that he did not wish to sign the waiver section of the form, but expressed his desire to continue to speak to Officer Oliva. *Id.* Further, Officer Oliva testified that once Muna began to make statements of admission, he stopped the Defendant, read the Defendant his rights again via his *Miranda* card that he carries with him, and "continued with the interrogation." *Id.* at 11:21:59 AM. The Defendant then elected not to make any more statements.

There is no evidence before the Court contradicting Officer Oliva's testimony that the Defendant desired to continue to speak to him even after first refusing to sign the waiver form. The Court also considers the following circumstances in determining whether Defendants act of continuing to speak to Oliva was knowing, intelligent and voluntary: there is no indication that Defendant *did not* understand the *Miranda* warnings, either the written GPD 9 form or the

oral admonition via Officer Oliva's *Miranda* rights card; Defendant has a history of prior criminal convictions and arguably has been administered *Miranda* warnings in each of those prior cases; Defendant clearly understood that the consequence of continuing to speak to Officer Oliva, admitting to one act of which the alleged victims complained, but disavowing another. Thus, the Court finds under the circumstances that Defendant engaged in a "course of conduct indicating waiver" knowingly and intelligently by continuing to speak to Officer Oliva after being apprised of his right to remain silent both verbally and in writing. Further, there is no evidence that Defendant does not understand the English language or that he did not understand the written or oral rights as presented to him. Finally, the totality of the circumstances, including: Muna's age (35 years old) and intelligence; the short length of detention and questioning; Defendant's prior criminal; and the fact that Miranda warnings were given both verbally and in writing, all support a finding that Defendant's waiver was knowing, intelligent and voluntary.

## CONCLUSION

Based on the foregoing, Defendant's Motion to Suppress is **DENIED**.[7]

**SO ORDERED** this _____APR 26 2021_____.

**SERVICE VIA E-MAIL**
I acknowledge that an electronic copy of the original was e-mailed to:
_AG, PDSC_

Date: 4-26-21  Time: 1:43pm

Deputy Clerk, Superior Court of Guam

**THE HONORABLE MARIA T. CENZON**
**Judge, Superior Court of Guam**

---

[7] The issuance of this Decision and Order shall resume the speedy trial clock as of the date of this Decision. A Criminal Trial Scheduling Order [Asserted] shall be issued separately.